The defendants are the partnership of Goudchaux's and the individual members thereof, Bernard Goudchaux and Harry Goudchaux. In June, 1938, the plaintiff company, through its Vice President, R.H. Casey, entered into a verbal contract with the defendants to install an air conditioning or ventilating system in their store located on Main Street in the City of Baton Rouge. The building is some hundred feet wide facing Main Street and extends back about the same distance, and is divided into three compartments of about the same size in the interior. At the time of the installation of the cooling system, the western compartment was being operated by Eric Sternberg under a lease from Goudchaux as a men's clothing store, and Goudchaux's operated the other two compartments as a general dry goods store.
The price agreed on for the cooling system was the sum of $1,960. After the system was installed, it proved unsatisfactory to the defendants and they refused to pay for it. This suit was brought to recover the contract price, and after a rather long-drawn-out trial in which much technical testimony was heard (the testimony covering over 400 pages), the court rendered a judgment in favor of the defendants and dismissed the suit. Plaintiff has appealed.
The principal dispute in the case revolves around the nature of the agreement as to just what the cooling system would do in giving relief from the heat in the three compartments of the building. In brief, the plaintiff claims that it was to install a ventilating system consisting of six large exhaust fans placed in penthouses on top of the building, and that the plaintiff company represented to the defendants that the system would change the air in the inside open portions of the building about once every minute when the fans were in operation. The defendants contend that the plaintiff agreed that the fans would create a breeze all over the inside of the store *Page 97 
equal to the breeze blown from a 24 inch fan which was running in front of the store in front of which Mr. Casey and Mr. Bernard Goudchaux were standing when the agreement was made. The defendants further contend that the fans were installed in a careless and negligent manner; that the penthouses were built out of inferior material and were not properly constructed; that these penthouses were built by raising the skylights on top of the building, and were constructed in violation of the building code of the City of Baton Rouge, and because of their faulty construction rainwater leaks into the building through the penthouses.
On the question of what the agreement was, the testimony of Casey who was representing the plaintiff, and that of Bernard Goudchaux who acted for the defendants, may be given in substance, as follows:
Mr. Goudchaux says that the cooling system was to create a breeze all over the inside of the store; that at the time he and Casey were talking about the effect of the system there was a 24 inch fan running in front of the store and they were in front of this fan, and Casey said, "Bennie (referring to Goudchaux), this is the way it is going to be all over the store." In all of his testimony on what he understood the agreement to be as to what the fans would do, Goudchaux comes back to this same expression. In other words, his understanding of the agreement was that the fans would produce a strong breeze in all parts of the interior of the store. He says that this understanding on his part was the reason he agreed for the system to be put in, as he was able to get a good breeze in parts of the store by placing fans around at various places.
Casey says that all he promised Goudchaux that the fans would do would be to change the air in the open spaces in the building every minute or so; that Goudchaux asked him if the fans to be installed would give as much air as the little 24 inch fan then running in front of them; that he told Goudchaux there would be no comparison, that while the little fan would deliver 5,000 cubic feet of air per minute, the store needed fans that would deliver 130,000 cubic feet of air per minute; that he told Goudchaux he would get the type of breeze coming from the small fan at any of the openings with all the fans operating; whereupon, Goudchaux told Casey to go ahead and put in the job. In other words, Casey claims that his only promise was that the fans would create a breeze like the small fan in front of them was creating only at the openings where the breeze would be pulled in by the fans.
The fans were installed and were used for a few days when Goudchaux complained to plaintiff that he was not getting relief in the store from the heat. The plaintiff sent men to the store in an effort to make the fans give better satisfaction. Doors and windows were opened and closed and other adjustments were made, but still the fans did not prove satisfactory to the defendants. Sternberg operated the fans in his compartment of the building for about two weeks and then quit using them altogether and went back to using his old fans. Goudchaux used the fans in his part of the store a little longer, but finally quit using the system and went back to his old fans. Goudchaux wrote plaintiff a letter on August 31, 1938, stating why the ventilating system was not satisfactory, and asked that the fans be removed.
The following facts and circumstances tend to support the contention of the defendants and the judgment rendered in their favor by the trial court:
(1) Goudchaux evidently understood from what Casey told him that the fans would create a breeze in all parts of the interior of the store. However, it would have been unreasonable for him to have believed from what Casey said that there would be a breeze all over the store as strong and as noticeable as the breeze that was blowing on these two men when they were standing in front of a twenty four inch fan. It seems to us that a person without any knowledge of cooling systems whatever could hardly believe that fans placed at various points in the store to blow out the air and pull in fresh air could cause a perfectly uniform and strong breeze all over the interior of the store. Goudchaux's own expert witness, Lucy, testified that such a breeze could not be created in every part of the store by this kind of a system.
(2) The letter which Goudchaux wrote plaintiff on August 31, 1938, in which he rejected the job, indicates that he understood that the fans would create a breeze, or as he puts it, that there would be a draft or circulation throughout the store. A careful reading of the testimony of Casey *Page 98 
(as well as that of his salesman and engineer, Cook) would not make it unreasonable for Goudchaux to have understood that there would be a draft or circulation of air in all parts of the store that could be felt by those in any part of the building. While Casey and Cook attempt to make it appear that they only promised that the breeze could be felt in certain parts of the building and not in what is termed "dead spaces", yet their subsequent conduct and acts in trying to create a draft in these dead spaces indicates that, if they did not intentionally lead Goudchaux to believe that the breeze could be felt all over the store, he had a right to assume from what was told him that such would be the case.
(3) If there was not to be a circulation throughout the store, there would have been no occasion for Goudchaux to put in the system, as he says, for the reason that he could get a breeze or a draft in parts of the building with the old fans he had been using. In fact, the statement of Casey that the fans would change the air in all parts of the building every minute was calculated to lead Goudchaux to believe that there would be a draft or breeze in all parts of the store.
(4) The evidence shows that the breeze could not be felt in all parts of the store. In fact, the breeze could only be felt in those parts of the store near the openings where the air was being pulled into the building; that a few feet from these air currents there was no perceptible effect. There are several booths and balconies in the building, making it impossible to feel the effect of any circulation in a good part of the store. The air was pulled in from the openings in front and taken out at the top through the roof, which, of course, had the effect of creating an air current from these openings to the fans in the top of the building. Some of the engineers claim that the air in the entire building was changed about every minute by these air currents, but they do not claim that a draft could be felt in every part of the building.
(5) Several employees in the store testified that the condition in the store was not any better after the fans were put in than before; that the old fans gave as much relief from the heat.
(6) The engineer who testified for the defendants stated that the system of ventilation put in by the plaintiff was not the kind of cooling system for the type of building in which the stores were operated; that the drafts of air from the openings to the outlets in the roof were not sufficient to change the air in the entire interior of the building; that this type of fans would give relief if they were placed in the walls just above the height of a person's head, thus causing the breeze to be felt in a larger area. While the plaintiff had installed many ventilating systems in residences, this was its first installation of such a system in a large commercial building.
(7) It also appears from the testimony that these fans were installed in a rather crude and unskillful manner. The penthouses on the roof were not made of very good material, and the skylights were not replaced so as to prevent leaks into the building. The flap doors in the penthouses were not made of good material, and they would not properly open and close.
Against all these points favorable to the contention of Goudchaux, it should be mentioned that the job was not to be a first class one — that is, the cooling system was not of the best and more expensive type. In fact, it is obvious that Goudchaux was not willing to pay the price of a first class cooling system. In other words, the job was one of expediency. An air conditioning or air wash system would have cost much more than this ventilating system.
There is some intimation that Goudchaux was trying to get his tenant, Sternberg, to pay a greater part of the cost of the system than he had agreed to pay; that shortly after the system was put in Goudchaux began negotiating with Sternberg whereby the latter was to rent the entire store, but he did not want to assume any obligation connected with the cooling system. But the evidence shows that this deal originated after the fans were installed.
Some of the engineers who testified for the plaintiff claim that the fans performed the function of changing the air in the building every minute or so, and that no more could be expected of this type of cooling system; that the system does give a certain amount of relief.
But taking the situation as a whole, we cannot say that Goudchaux was not justified in refusing to pay for a system which did not give him the relief that he reasonably believed from what he was told would result from the installation of the fans. In any event, we are not in a position to hold that the trial judge fell into manifest *Page 99 
error in finding the facts to be in favor of defendants' contention.
The situation is rather similar to that which permits a purchaser to annul a sale for defects and vices in the thing sold. The buyer may avoid the sale if the defect is of such a nature as to render the thing sold unfit for the purpose for which it was purchased, or its use so inconvenient and imperfect, that it must be assumed that the purchaser would not have bought it had he known of the defect. Civil Code, Art. 2520. The defendants are in the situation of the buyer, and the facts show that the cooling system sold them by the plaintiff was so defective and imperfect in construction and operation, and its use so imperfect, that it may be supposed that the defendants would not have contracted for its installation had they been aware of its deficiencies in performance and the result to be obtained from it.
Finding no error in the judgment appealed from, the same is hereby affirmed at the cost of the plaintiff in both courts.